**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

RUSLAN KONOVALCHUK,

                              Plaintiff,

        v.

MICHAEL F. CERMINARO, Police Officer,
Utica Police Department; ANKEN, Police Officer,
Utica Police Department; FRENCH, Police Officer,
Utica Police Department; AIMEDIN MEKIC, Police
Officer, Utica Police Department; OFFICER MOORE,
Police Officer, Utica Police Department; SCULLY,
Police Sergeant, Utica Police Department;
TIMOTHY MOORE, Investigator, Utica Police
Department; PETRIE, Police Officer, Utica Police
Department; CUDA, Parole Officer; PEZDEK,
Parole Officer; CARROL, Senior Parole Officer;
CITY OF UTICA; COUNTY OF ONEIDA;
ALBAN URYNIAK, Utica Police Sergeant; JAMES
WATSON, Utica Police Captain; JEFFREY
FARRELL, Oneida County Sheriff Deputy,

                          Defendants.[1]

No. 11-CV-1344
(MAD/CFH)

_____

**APPEARANCES:**

RUSLAN KONOVALCHUK
Plaintiff Pro Se
12-B-1663
Clinton Correctional Facility
Post Office Box 2002
Dannemora, New York 12929


MARK C. CURLEY, ESQ.

**OF COUNSEL:**


JOHN P. ORILIO, ESQ.

---

    [1] In his notice and acknowledgment of receipt of summons and complaint, defendant Carrol spells his name as "Carroll." Dkt. No. 12. The Court considers this as a mere error on Konovalchuk's part and uses the latter spelling throughout this report-recommendation. Furthermore, Konovalchuk concedes that defendant Officer Moore is the same person as defendant Investigator Timothy Moore. Konovalchuk Dep. (Dkt. No. 97-7) at 53:4–16.

Corporation Counsel for the
  City of Utica
Attorney for City Defendants
One Kennedy Plaza, Second Floor
Utica, New York 13502

JOAN K. HARRIS, ESQ.

BARTH, SULLIVAN LAW FIRM
Attorney for County Defendants
224 Harrison Street
Syracuse, New York 13202

DAVID H. WALSH, IV, ESQ.

HON. ERIC T. SCHNEIDERMAN
Attorney General for the
  State of New York
Attorney for State Defendants
The Capitol
Albany, New York 12224-0341

KRISTEN M. QUARESIMO, ESQ.
Assistant Attorney General

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[2]

Plaintiff <u>pro se</u> Ruslan Konovalchuk ("Konovalchuk"), an inmate currently in the custody

of the New York State Department of Correctional and Community Supervision ("DOCCS"),

brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, nine law

enforcement officers of the Utica Police Department ("UPD"), the City of Utica ("Utica"), the

Sheriff Deputy of the County of Oneida, the County of Oneida ("Oneida"), and three New

York State parole officers, violated his constitutional rights under the Fourth and Fourteenth

Amendments.  Am. Compl. (Dkt. No. 56).  Presently pending are:  (1) Konovalchuk's motion

for summary judgment pursuant to Fed. R. Civ. P. 56 against the City Defendants (Dkt. No.

94); (2) State Defendants' motion for summary judgment (Dkt. No. 97); (3) County

---

[2]  This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Defendants' cross-motion for summary judgment (Dkt. No. 98); and (4) City Defendants'

cross-motion for summary judgment (Dkt. No. 100).  Konovalchuk opposes City

Defendants' cross-motion.  Dkt. No. 103.  City Defendants replied to Konovalchuk's

opposition.  Dkt. No. 105.  For the following reasons, it is recommended that:  (1)

Konovalchuk's motion be denied; (2) State Defendants' motion be granted; (3) County

Defendants' cross-motion be granted; and (4) City Defendants' cross-motion be granted in

part and denied in part.


## I.  Failure to Respond

"[J]udgment should not be entered by default against a pro se plaintiff who has not been

given any notice that failure to respond will be deemed a default."  Champion v. Artuz, 76

F.3d 483, 486 (2d Cir. 1996).  County Defendants provided such notice along with their

cross-motion.  Dkt. No. 98-7.  Moreover, the Court provided notifications to Konovalchuk

regarding both the date of his response and the consequences of failing to respond.  Dkt.

No. 101; Text Notice dated 8/23/2013.  Konovalchuk only responded to City Defendants'

cross-motion.  Dkt. No. 103.  Despite such notice and extensions, and Konovalchuk's

demonstrated ability to respond to opposing arguments, Konovalchuk failed to respond to

State and County Defendants' motions.  Because Konovalchuk has not responded to raise

any question of material fact, to the extent State and County Defendants have pled properly

supported facts, such facts as set forth by those defendants are accepted as true.

See Cusamano v. Sobek, 604 F. Supp. 2d 416, 452–53, 453 n.48 (N.D.N.Y. 2009);

see also N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported

facts set forth in the Statement of Material Facts that the opposing party does not

specifically controvert.") (emphasis in original).


## II. Background

## A. Konovalchuk's Version of the Facts

### i. July 28, 2011

At approximately 1:45 p.m. on July 28, 2011, Konovalchuk drove away from his brother's residence in Utica. Am. Compl. ¶ 1. Konovalchuk was staying at his brother's residence because he violated his curfew in Rochester and was attempting to avoid jail time. Konovalchuk Dep. (Dkt. No. 97-7) at 7:1–8:18. Shortly thereafter, Konovalchuk noticed two unmarked vehicles following him and evaded them by making random turns. Am. Compl. ¶¶ 2–4; Konovalchuk Dep. at 13:13–14:1, 16:14–17:7. When Konovalchuk realized that both police vehicles and unmarked vehicles were pursuing him, he sped up, exceeding the forty to forty-five miles-per-hour speed limit at sixty to sixty-five miles-per-hour. Am. Compl. ¶ 8; Konovalchuk Dep. at 17:12–18:1. At some point, Konovalchuk exited a highway, speeding at a hundred miles-per-hour. Konovalchuk Dep. at 18:2–22. He entered a motel parking lot and hid for ten to fifteen minutes. Id. at 18:2–19:2.

Konovalchuk left the motel, driving at ninety miles-per-hour and passing two UPD vehicles going in the opposite direction. Am. Compl. ¶ 7; Konovalchuk Dep. at 19:22–21:22. Konovalchuk turned into a trailer park community, exited his vehicle, and waited by his vehicle for the police to arrive. Am. Compl. ¶¶ 9–10; Konovalchuk Dep. at 22:2–21, 26:3–22. He unaware that a warrant was out for his arrest. Konovalchuk Dep. at 23:22–25. After approximately five minutes, defendants UPD Officers Anken and French arrived and approached Konovalchuk and drew their weapons. Am. Compl. ¶ 11. Anken

4

ordered Konovalchuk to turn around with his hands behind his head and Konovalchuk complied. Id. ¶ 12. Anken lifted Konovalchuk's shirt to check for a weapon and found none. Id. ¶ 13; Konovalchuk Dep. at 29:8–23. Anken ordered Konovalchuk to lie face-down on the ground and Konovalchuk complied without resistance. Am. Compl. ¶ 14; Konovalchuk Dep. at 29:8–23, 64:6–18. Anken and French then hand-cuffed Konovalchuk. Id. ¶ 15. At this time, more officers arrived at the scene. Id. ¶ 16. Konovalchuk did not resist arrest, did not refuse to be handcuffed, and never tucked his hands underneath his body to prevent being handcuffed. Dkt. No. 103-1 at 1–2; Konovalchuk Dep. at 30:18–31:1.

While Konovalchuk was lying on the ground with hands cuffed behind his back, defendants UPD Officers Cerminaro, Anken, French, Mekic, Moore, and Parole Officers Cuda and Pezdek repeatedly punched, kicked, and stomped on Konovalchuk. Am. Compl. ¶ 17; Dkt. No. 94-1 at 2. Defendant Senior Parole Officer Carroll observed and failed to intervene while other officers assaulted Konovalchuk. Am. Compl. ¶ 17. However, Konovalchuk is uncertain whether Carroll was present to intervene on his behalf. Konovalchuk Dep. at 83:17–84:22. At some point, only Cerminaro was striking him while other officers held him down. Dkt. No. 94-1 at 2–3. Meanwhile, defendants Carroll, Sergeant Uryniak, Sergeant Scully, and Moore observed the assault and failed to intervene on Konovalchuk's behalf. Am. Compl. ¶ 18. Konovalchuk could only see black boots surrounding him as he was lying on the ground and could not identify which defendant delivered which strike. Konovalchuk Dep. at 31:12–32:24.

Konovalchuk was then lifted off the ground and slammed against a building wall that was approximately eight feet away. Am. Compl. ¶ 19; Konovalchuk Dep. at 32:1–35:8. Unknown persons pinned Konovalchuk against the wall while Cerminaro choked

Konovalchuk. Am. Compl. ¶¶ 20–21. While unspecified individuals forced Konovalchuk to bend over at the waist, Carroll tightly gripped Konovalchuk's neck. Id. ¶¶ 22–23; Konovalchuk Dep. at 83:8–16. Carroll then swung a police radio up and down in an attempt to hit Konovalchuk's face and stated, "[y]ou have one chance to answer. What's your name?" Am. Compl. ¶ 23. Konovalchuk stated his name and Carroll released his grip. Id. ¶¶ 23–24.

At this time, Cerminaro again choked Konovalchuk and, with assistance from unspecified persons, dragged and carried Konovalchuk to the back of a police vehicle, hitting Konovalchuk's head on a car door. Am. Compl. ¶ 24; Konovalchuk Dep. at 36:6–37:2. Cerminaro transported Konovalchuk to the UPD, during which time, Cerminaro stated, "[y]ou're lucky. It could've been a lot worse." Am. Compl. ¶ 25; Konovalchuk Dep. at 40:17–18. Konovalchuk's request to Cerminaro for medical attention was denied. Dkt. No. 94-1 at 3–4. Cuda and Pezdek were in the vicinity watching Konovalchuk being assaulted and failing to intervene. Am. Compl. ¶ 46.

At the UPD, while handcuffed to a bench, Konovalchuk asked defendant UPD Officer Petrie for medical attention because he was hurt and in pain. Am. Compl. ¶¶ 26–27. Petrie replied, "I don't care, I'm busy." Id. ¶ 27; Konovalchuk Dep. at 55:6–15. While defendant Captain Watson was making his rounds, Konovalchuk informed Watson that he was assaulted by the arresting officers, was hurt and in pain, and required medical attention. Am. Compl. ¶ 29; Konovalchuk Dep. at 42:23–43:8. Watson replied that he would send someone to see Konovalchuk. Am. Compl. ¶ 29. A few hours later, an unnamed female

officer arrived and took photographs of Konovalchuk's head, face, and neck.[3]  Id. ¶ 30.

These photos fairly and accurately depict all of the physical injuries that Konovalchuk

suffered from the arrest.[4]  Konovalchuk Dep. at 78:22–79:4.  Konovalchuk filed a Civilian

Complaint Form complaining of the assault and submitted it to an unnamed male officer.[5]

Am. Compl. ¶ 31; Dkt. No. 97-11 at 1–3.  Konovalchuk was not seen by medical personnel

for his injuries and passed out several times on the bench due to dizziness and sleepiness.

Am. Compl. ¶ 32.

   Later in the evening on July 28, 2011, Konovalchuk was transported to Monroe County

Jail ("Monroe") and was unconscious throughout most of the ride.  Am. Compl. ¶ 33.  As a

result of the assaults, Konovalchuk sustained injuries to his neck, face, and head, and was

treated with pain medication at Monroe.  Id. ¶ 34.  Konovalchuk was also diagnosed with

"post-traumatic concussion," which, according to Konovalchuk, is bleeding in the brain as a

result of being kicked in the head.  Id. ¶ 35.  Konovalchuk had an X-ray done in October,

2011 and a Computed Tomography ("CT") Scan in January, 2012; both tests showed no

abnormalities.  Konovalchuk Dep. at 60:4–21; Dkt. No. 97-8 at 36, 38–40.  Konovalchuk's

medical records dated between August, 2011 and October, 2011 show he had complained

---

   [3]  These photos of Konovalchuk show abrasions on both sides of the face, left
temple, left side of the neck, left forearm, and a cut on the nose.  Dkt. No. 97-7 at 114–24.

   [4]  An inmate medical screening form dated July 29, 2011, the source of which is
unknown, indicates that Konovalchuk's face was stomped on the day before and showed
multiple abrasions.  Dkt. No. 94-2 at 17.

   [5]  Konovalchuk indicated in his complaint that he had complied with police orders
during the arrest and as soon as he was handcuffed he was repeatedly kicked in the face
by the arresting officers.  Dkt. No. 97-11 at 1.

of migraine headaches and was treated with pain medication with minimal results.[6]  Dkt. No. 94-2 at 18–22; see also Dkt. No. 97-8 at 4–32.

As a result of the arrest on July 28, 2011, Konovalchuk was charged with resisting arrest, fleeing police officers, reckless driving, and various other counts of vehicular violations.  Dkt. No. 94-1 at 2, 94-2 at 3–4.  All charges were dropped except Konovalchuk's guilty plea to fleeing from officers in a motor vehicle.  Konovalchuk Dep. at 51:12–17; Dkt. No. 94-2 at 3–4.  Konovalchuk reasons that since police documents indicate certain defendants were present at the scene of arrest, those defendants either assaulted him or witnessed the assault.  Konovalchuk Dep. at 51:20–54:12–21.


### ii.  October 11, 2011

At approximately 6:33 a.m. on October 11, 2011, two Oneida County Sheriff Deputies took Konovalchuk to the Utica City Court and returned him to Monroe at approximately 2:30 p.m.  Am. Compl. ¶¶ 36–37.  Konovalchuk asked the Sheriff Deputies for food and water; however, such requests were denied.  Id. ¶ 37.  During the transports, Konovalchuk also asked defendant Sheriff Deputy Farrell to cease smoking cigarettes in the vehicle because he could not breathe.  Id. ¶ 38.  Farrell refused.  Id.  As a result, Konovalchuk inhaled second-hand cigarette smoke during each of the two-and-a-half hour car ride to-and-from the Utica City Court.  Id. ¶ 39.  Konovalchuk returned to Monroe and had dinner. Konovalchuk Dep. at 91:3–12.  Konovalchuk then commenced this action, seeking

---

[6]  Konovalchuk's medical records also indicate that he continued to complain of a July 2011 head injury and accompanying headaches from June through November of 2012.  Dkt. No. 97-9 at 6, 8–9, 17–20, 22.

monetary damages.  Am. Compl. at 19.

## B.  Defendants' Version of the Facts

### i.  July 28, 2011

According to defendant Senior Parole Officer Carroll, Konovalchuk was released from prison on August 27, 2010, having served time for robbery convictions, and paroled under DOCCS's supervision for a term of five years.  State Defs.' Statement (Dkt. No. 97-1) ¶ 3; Carroll Decl. ¶¶ 1, 5; Dkt. Nos. 94-2 at 6, 97-13 at 1–3.  Konovalchuk had violated several conditions of release, which included violating a 9:00 p.m. curfew and failing to obtain permission from his parole officer before leaving Monroe County.  State Defs.' Statement ¶¶ 4–6; Carroll Decl. ¶ 6; Dkt. No. 97-13 at 1–3.

On July 28, 2011, the majority of the defendants was assigned to different teams as part of a multi-agency Task Force conducting a "warrants sweep," which included executing a warrant for Konovalchuk's arrest in connection to his violation of parole release conditions and a bank robbery.[7]  Moore Aff. (Dkt. No. 100-6 at 1–7) ¶ 3; Pezdek Decl. (Dkt. No. 97-16) ¶¶ 1, 6; Carroll Decl. (Dkt. No. 97-12) ¶¶ 7, 9; Cerminaro Aff. (Dkt. No. 100-8 at 1–4) ¶ 1; Dkt. No. 97-14 (fugitive warrant).  One team consisted of defendants Police Officer Moore and Parole Officer Pezdek, who were in an unmarked vehicle near the house of Konovalchuk's brother conducting surveillance.  Moore. Aff. ¶ 5; Pezdek Decl. ¶ 6.  Moore

---

[7]  The Task Force consisted of eight law enforcement agencies and twenty-five law enforcement officers to track down fugitives.  Carroll Decl. ¶¶ 7, 9.  The agencies included the UPD Warrants Division, New York-New Jersey Fugitive Task Force, New York State Police Department and Parole Division, Oneida County Probation Department, and the District Attorney's Office.  Moore Aff. ¶ 4.

and Pezdek followed Konovalchuk, who was driving a green colored Acura leaving the house. Moore. Aff. ¶ 5; Pezdek Decl. ¶¶ 7–8.

Konovalchuk abruptly stopped, exited his vehicle, and verbally confronted the driver of a parked white vehicle while holding what appeared to be a black semi-automatic handgun.[8] Moore. Aff. ¶ 5; Pezdek Decl. ¶¶ 9–10. Konovalchuk returned to the Acura and sped off. Moore. Aff. ¶ 6. Moore and Pezdek followed Konovalchuk, who was driving erratically and speeding through city streets at eighty-five miles-per-hour then entered a highway speeding at 115 miles-per-hour. Moore. Aff. ¶¶ 6–7; Pezdek Decl. ¶ 11. Moore and Pezdek transmitted over the police radio the description of the vehicle and Konovalchuk, relaying information that Konovalchuk was possibly armed with a handgun. Moore. Aff. ¶ 6; Pezdek Decl. ¶¶ 11. Shortly thereafter, a radio transmission was received indicating that Konovalchuk was apprehended and in custody in a trailer park several miles away. State Defs.' Statement ¶ 24; Pezdek Decl. ¶¶ 12, 16. When Moore and Pezdek arrived at the trailer park, Konovalchuk was handcuffed and placed in the backseat of a UPD vehicle, refusing to speak with officers. State Defs.' Statement ¶ 25; Moore Aff. ¶ 9; Pezdek Decl. ¶¶ 13, 15; Dkt. No. 100-6 at 10. Moore did not see any visible injuries on Konovalchuk. Moore Aff. ¶ 10. Pezdek had no contact with Konovalchuk on July 28, 2011 and did not make threats or use physical force against Konovalchuk. State Defs.' Statement ¶ 21; Pezdek Decl. ¶¶ 14, 17–18. Pezdek did not witness the use of any physical force towards Konovalchuk by any DOCCS staff or police officer. State Defs.' Statement ¶¶ 22–23; Pezdek Decl. ¶ 19.

---

[8] After Konovalchuk was taken into custody, an air-pistol was discovered in the green Acura. Dkt. No. 94-2 at 8.

At approximately 1:30 p.m., defendant Anken, an UPD patrol officer, received a radio transmission involving a possibly armed suspect fleeing from the police in an Acura.  Anken Aff. (Dkt. No. 100-7) ¶¶ 1, 3; Dkt. No. 100-7 at 6.  Anken located and followed the Acura into a trailer park and observed Konovalchuk exiting the vehicle and fleeing on foot.  Anken Aff. ¶ 5.  Konovalchuk exited his patrol car, drew his service weapon, and ordered Konovalchuk to stop and place his hands on his head.  Id.  No other officers were present at this time and Anken ordered Konovalchuk to face away in order to check Konovalchuk's waistband for a weapon.  Id.  Within moments, defendant UPD Officer French arrived and assisted in getting Konovalchuk to the ground in a prone position to be handcuffed.  Id. ¶ 6.  Konovalchuk refused to be handcuffed.  Id.  Anken knelt on Konovalchuk's back to try to release and secure one of Konovalchuk's hands and noticed that French was also struggling with Konovalchuk's other hand.  Id. ¶ 7.  Once handcuffed, Konovalchuk was lifted off the ground and searched for any weapon on his person before being walked to a UPD vehicle.  Id. ¶ 8.  Anken never kicked Konovalchuk and did not witness any other officer kicking Konovalchuk.  Id. ¶ 9.

Another UPD patrol officer, defendant Cerminaro, also received a radio transmission regarding the high-speed car chase involving Konovalchuk.  Cerminaro Aff. ¶ 4.  Cerminaro located and joined in the pursuit of the Acura, entered the trailer park, observed Konovalchuk lying on the ground in prone position, and saw Anken and French struggling to gain control of Konovalchuk's hands and arms.  Id. ¶¶ 4–5.  Cerminaro then struck and sat on Konovalchuk's upper torso and shoulders to try to release Konovalchuk's hands and arms.  Id. ¶ 6; Dkt. No. 94-2 at 7.  Defendant Sergeant Uryniak arrived at the scene and upon seeing Anken, French, and Cerminaro struggling to handcuff Konovalchuk, placed a

foot on Konovalchuk's legs that were thrashing about and ordered Konovalchuk to stop resisting. Dkt. No. 94-2 at 28–29. Defendant Officer Mekic joined in restraining Konovalchuk, who was rolling from side to side. Id. at 26. Konovalchuk was lifted off the ground and searched for weapons before being walked to his police vehicle for transport to UPD. Cerminaro Aff. ¶ 7. At no time did Cerminaro kick Konovalchuk or witness other officers kicking him at any time. Id. ¶ 8. At some point after the arrest and prior to booking, Cerminaro asked Konovalchuk if he wanted to see medical personnel but Konovalchuk did not respond. Dkt. No. 94-2 at 8.

Carroll was a passenger with non-party Officer Colborne in an unmarked police vehicle driven by the Oneida County Sheriff. Carroll Decl. ¶ 8. At approximately 1:00 p.m., Carroll received radio transmissions indicating that members of the Task Force were engaged in a high-speed car chase with Konovalchuk. Id. ¶¶ 10–11. As Carroll was on his way to join in the pursuit, another radio transmission indicated that Konovalchuk was apprehended several miles away and taken into custody after driving into a trailer park. Id. ¶¶ 12, 22; State Defs.' Statement ¶ 35. When Carroll arrived at the trailer park, Konovalchuk was handcuffed and seated in the back of a marked police vehicle. Carroll Decl. ¶ 13; State Defs.' Statement ¶ 36. Carroll repeatedly asked Konovalchuk for identification but Konovalchuk refused. Carroll Decl. ¶ 14.

Defendant Parole Officer Cuda was teamed up with non-party Deputy Kallaur, driving in an unmarked police vehicle. Cuda Decl. (Dkt. No. 97-15) ¶¶ 1, 5. At 2:00 p.m., Cuda received a radio transmission indicating that Konovalchuk was seen at a nearby gas station. Id. ¶ 6. Cuda drove towards the gas station, located the vehicle, and pursued it. Id. ¶ 7. Konovalchuk was speeding and driving erratically. Id. ¶ 8. When a line of police vehicles

joined the pursuit, Kallaur pulled over to allow two marked police cars to continue ahead.
Id. ¶ 9. Eventually, Cuda lost sight of the two police cars and Konovalchuk's vehicle. Id. ¶ 10. Another radio transmission indicated that Konovalchuk was apprehended and taken into custody in a trailer park at least a mile away and Cuda drove there to assist. Id. ¶¶ 11, 15; State Defs.' Statement ¶ 30. Upon arrival, Cuda saw Konovalchuk in the backseat of a police vehicle. Cuda Decl. ¶ 12; State Defs.' Statement ¶ 31. Cuda approached and asked Konovalchuk if he was on parole and Konovalchuk refused to answer. Cuda Decl. ¶ 12. Konovalchuk never advised Cuda that he was assaulted during his arrest. Id. ¶ 13. Cuda was not involved with taking Konovalchuk into custody. Id. ¶ 14. Cuda never made threats or used force against Konovalchuk and did not witness any DOCCS staff or police officer use physical force against Konovalchuk. Id. ¶¶ 16–18; State Defendants' Statement ¶¶ 27–29.

At the UPD booking room, Carroll first learned of Konovalchuk's complaints of assault when Konovalchuk asked to whom he should file his complaint regarding the alleged assault. Carroll Decl. ¶¶ 19–20. Carroll attested that no DOCCS staff were involved in taking Konovalchuk into custody. Id. ¶ 21. Carroll never used force or made threats against Konovalchuk at any time and did not witness any DOCCS staff or police officer use force against Konovalchuk. Id. ¶¶ 24–26; State Defs.' Statement ¶¶ 33–34.

Defendant Officer Petrie reported that Konovalchuk was hostile and argumentative towards him when he searched and booked Konovalchuk. Dkt. No. 94-2 at 4. Konovalchuk informed Petrie that he was kicked by the arresting officers to which Petrie responded that he should speak with a supervisor about the incident. Id.

Defendant Scully, an UPD sergeant, observed Konovalchuk sitting on a bench in the

booking area with no sign of any serious physical injury but did notice red marks and scratches on Konovalchuk's face. Scully Aff. (Dkt. No. 100-10 at 2–3) ¶¶ 1, 3, 5. Scully did not communicate with Konovalchuk nor was he advised that Konovalchuk had required medical attention. Id.

Non-party Trevisani, an UPD investigator assigned to the Office of Professional Standards, investigated Konovalchuk's civilian complaint and obtained a statement from non-party Terry Vilardi, a civilian witness. Trevisani Aff. (Dkt. No. 100-9 at 2–3) ¶¶ 1–3. Vilardi was at home on July 28, 2011 and saw

> a white male gentleman face down on the ground between [his] . . . home and . . . driveway. He had just been handcuffed and was struggling with officers, and was rolling around from side to side. I believe there were approximately 6 officers with this white male gentleman and they were all standing and preparing to lift him up. They picked him up immediately off the ground by his arms and walked him to a white police car.

Dkt. No. 100-9 at 5. Trevisani determined that no officer committed misconduct with respect to Konovalchuk's arrest. Trevisani Aff. ¶ 5.


### ii. October 11, 2011

On October 10, 2011, Konovalchuk had three meals at Monroe. County Defs.' Statement (Dkt. No. 98-1) ¶ 7; Konovalchuk Dep. at 89:10–14. On October 11, 2011, defendant Deputy Farrell and non-party Deputy Barnes transported Konovalchuk from Monroe to Utica. County Defs.' Statement ¶¶ 3–4; Farrell Aff. (Dkt. No. 98-5) ¶ 4; Konovalchuk Dep. at 88:25–89:3. Farrell arrived at Monroe and left with Konovalchuk at approximately 6:30 a.m. County Defs.' Statement ¶ 5; Farrell Aff. ¶ 5; Konovalchuk Dep. at 89:15–17; Dkt. No. 98-6. Konovalchuk did not have breakfast prior to the transport to Utica

14

but had access to water.  County Defs.' Statement ¶¶ 8–9; Konovalchuk Dep. at 89:22–90:4.  During the transport to Utica, Konovalchuk never informed Farrell that he had missed breakfast or was hungry.  Farrell Aff. ¶ 7.

The transport from Monroe to Utica took between two to two-and-a-half hours.  County Defs.' Statement ¶ 10; Konovalchuk Dep. at 90:5–7; Dkt. No. 98-6.  Farrell smoked two cigarettes in the transport vehicle with his window partially down.  County Defs.' Statement ¶¶ 17–18; Farrell Aff. ¶ 8; Konovalchuk Dep. at 91:13–17, 93:3–12.  Konovalchuk did not complain to Farrell of the cigarette smoke.  Farrell Aff. ¶ 8.  At Utica, Konovalchuk was held at a lockup where inmates could access a water fountain without permission.  Id. ¶ 10.  When Farrell and Barnes picked up Konovalchuk, Konovalchuk asked Farrell if he could have something to eat.  Id. ¶ 12.  They drove to the Oneida County Courthouse and Barnes was informed that lunches were not available.  Id. ¶ 13.  While Farrell and Konovalchuk waited, Konovalchuk asked Farrell for a cigarette and Farrell refused the request.  Id.

On the way back to Monroe, Farrell smoked two cigarettes and again had his window partially down.  Farrell Aff. ¶ 15.  Konovalchuk did not complain about the cigarette smoke during that transport, nor did he complain about hunger or thirst.  Id.  When Konovalchuk returned to Monroe, he had access to water and had dinner at 4:30 p.m.  County Defs.' Statement ¶¶ 15–16; Konovalchuk Dep. at 94:6–9, 14–16.  When Konovalchuk returned to Monroe, he did not seek treatment for inhaling second-hand cigarette smoke.  County Defs.' Statement ¶ 21; Konovalchuk Dep. at 93:18–20.

## III.  Discussion[9]

Konovalchuk contends that defendant Farrell violated his First and Fourteenth
Amendment rights when Farrell denied him food and water, forced Exposure to
Environmental Tobacco Smoke ("ETS") onto him, all done in retaliation for filing a complaint
against the arresting officers.  Konovalchuk contends that his Fourth Amendment right
against the use of excessive force was violated when:  (1) defendants Cerminaro, Anken,
French, Mekic, Moore, Cuda, and Pezdek assaulted him while he was hand-cuffed, lying
face-down on the ground; (2) defendant Carroll gripped his neck and attempted to assault
him with a police radio; and (3) defendant Cerminaro choked him twice and dragged him to
the police vehicle, hitting his head on the car door.  It may also be inferred from the
allegations that Konovalchuk was attempting to allege he was arrested without probable
cause.  Further, Konovalchuk claims his Fourteenth Amendment rights were violated when:
(1) defendants Carroll, Uryniak, Scully, and Moore failed to intervene the assault on the
ground and a slam against a wall; (2) defendants Cuda, Pezdek, Anken, Scully, Uryniak,
and Moore failed to intervene Carroll holding him in a tight grip and threatened him with a
radio; (3) defendants Anken, French, Mekic, Moore, Uryniak, Scully, Carroll, Cuda, Pezdek
failed to intervene Cerminaro choking him twice and having his head hit the police car door;
and (4) defendants Cerminaro, Petrie, and Watson denied him medical care after being
informed that he was hurt and in pain.  As for defendants Oneida and Utica, Konovalchuk
contends they failed to train their employees, resulting in the above unconstitutional

---

[9]  In his amended complaint, Konovalchuk repeatedly raises his claims under the
Eighth Amendment.  Am. Compl. ¶¶ 40–51.  However, his claims are more appropriately
raised and analyzed under the Fourth and Fourteenth Amendments.  <u>See</u> subsections
III(E)(F).

16

conduct.  Am. Compl. ¶¶ 40–51.  Konovalchuk moved for summary judgment, contending

that he is entitled to judgment in his favor as a matter of law.  Dkt. No. 94-1.

## A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any

material fact if supported by affidavits or other suitable evidence and the moving party is

entitled to judgment as a matter of law.  The moving party has the burden to show the

absence of disputed material facts by informing the court of portions of pleadings,

depositions, and affidavits which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue

for trial.  The non-moving party must do more than merely show that there is some doubt or

speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could

find in favor of the non-moving party for a court to grant a motion for summary judgment.

Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v.

Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the

non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

17

[t]here are many cases in which we have said that a <u>pro se</u> litigant is entitled to "special solicitude," . . . that a <u>pro se</u> litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into <u>pro se</u> submissions claims that are not "consistent" with the <u>pro se</u> litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by <u>pro se</u> litigants," . . . and that <u>pro se</u> status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

<u>Id.</u> (citations and footnote omitted); <u>see also</u> <u>Sealed Plaintiff v. Sealed Defendant #1</u>, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds <u>pro se</u>, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. <u>Anderson</u>, 477 U.S. at 247–48.

### B. Eleventh Amendment

State Defendants argue that they are entitled to Eleventh Amendment immunity against Konovalchuk's claims. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 98

(1984) (citing <u>Hans v. Louisiana</u>, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. <u>Halderman</u>, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states.  <u>See</u> <u>Quern v. Jordan</u>, 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  <u>Farid v. Smith</u>, 850 F.2d 917, 921 (2d Cir. 1988) (<u>citing</u> <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974)).  "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Here, because Konovalchuk seeks monetary damages against State Defendants for acts occurring within the scope of their duties, the Eleventh Amendment bar applies and serves to prohibit claims for monetary damages against them in their official capacity.

Accordingly, State Defendants' motion on this ground should be granted.


### C.  Personal Involvement

State Defendants argue that they were not personally involved in the alleged constitutional violations; thus Konovalchuk's claims against them should be dismissed.[10]

---

[10]  State Defendants note that because Konovalchuk cannot prove that they were personally involved in any resulting injuries from the use of force incidents of July 28, 2011, Konovalchuk has also failed to establish the requisite proximate cause element of a § 1983 claim.  Dkt. No. 97-2 at 21–22.  However, because it is recommended herein that

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[11]

---

State Defendants' motion as to the Fourth and Fourteenth Amendment claims be granted on other grounds, their motion based on the proximate cause element need not be addressed.

[11] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010)

### i. Cuda and Pezdek

Konovalchuk has failed to establish the personal involvement of Cuda and Pezdek for his claims of excessive force and failure to intervene. Konovalchuk believes Cuda and Pezdek were present when other officers assaulted him and does not know if either defendant struck him because he could not see their faces. Contrary to Konovalchuk's assertion, both Cuda and Pezdek attested that upon their arrival at the scene of arrest, Konovalchuk was already handcuffed and taken into custody in the back of a police vehicle. Konovalchuk does not point to record evidence controverting the affidavits of Cuda and Pezdek.

While "an arrestee's 'inability to positively identify those who allegedly violated his rights is not per se fatal to his claims" Konovalchuk does not point to any record evidence establishing that Cuda or Pezdek was at Konovalchuk's arrest either before or during the time of the alleged use of excessive force. De Michele v. City of New York, No. 09-CV-9334 (PGG), 2012 WL 4354763, at *16 (S.D.N.Y. Sept. 24, 2012) (Dkt. Nos. 97-3 at 32–49, 97-4 at 2) (citations omitted).[12] Despite Konovalchuk's speculative assertions, it is fair to conclude that a rational factfinder could not find in favor of Konovalchuk as the record is devoid of any evidence indicating that either Cuda or Pezdek was present at the assault. See, e.g., Coleman v. Hauck, No. 09-CV-1391 (GTS)(GHL), 2012 WL 4480684, at *9 (N.D.N.Y. Sept. 26, 2012) (Dkt. No. 97-3 at 19–31) (granting summary judgment for certain defendants on personal involvement grounds where plaintiff argued that "[a]ll named

_____

(disagreeing that Iqbal eliminated Colon's personal involvement standard).

[12] All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

Defendants responded to the scene where Plaintiff was repeatedly struck and kicked in the face" but failed to point to record evidence establishing that those defendants arrived at the scene before the use of force was applied).

Furthermore, Konovalchuk failed to proffer any evidence showing that defendants had "a realistic opportunity to intervene to prevent the harm from occurring." De Michele, 2012 WL 4354763, at *17 (citing inter alia Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)) (internal quotation marks omitted).  As Konovalchuk does not provide even a scintilla of evidence that Cuda and Pezdek were present at the time of the alleged assaults, Konovalchuk cannot show that these defendants directly participated in the assaults or failed to intervene in the misconduct.  Moreover, Konovalchuk does not allege that either Cuda or Pezdek created a policy or custom under which unconstitutional practices occurred or were grossly negligent in their supervision.  Colon, 58 F.3d at 873.  Therefore, Konovalchuk cannot establish the personal involvement of Cuda and Pezdek in the alleged unconstitutional actions.

Accordingly, State Defendants' motion on this ground should be granted.


### ii.  Carroll

For largely the same reasons, Konovalchuk also failed to establish the personal involvement of Carroll.  Konovalchuk testified that Carroll used excessive force against him and failed to intervene when he was assaulted by other defendants.  While Konovalchuk claims that Carroll was present during the assaults, he testified that he is uncertain whether Carroll was present or observed him being assaulted.  On the other hand, Carroll attested that upon his arrival at the scene of arrest, Konovalchuk was already handcuffed and

22

seated in a police vehicle. Carroll did not learn of the alleged assaults until Konovalchuk was transported to the UPD for booking. Konovalchuk's failure to point to record evidence showing that Carroll was present before or at the time of his arrest is fatal to his claims against Carroll. Coleman, 2012 WL 4480684, at *9; De Michele, 2012 WL 4354763, at *16. Such speculative and conclusory allegations are insufficient to withstand a summary judgment motion. Matsushita Elec. Indus. Co., 475 U.S. at 586. The failure to adduce any evidence showing that Carroll was present when the alleged misconduct occurred must render those relevant claims meritless. Ali v. Szabo, 81 F. Supp. 2d 447, 463 (S.D.N.Y. 2000) (collecting cases). Moreover, Konovalchuk does not allege that Carroll created a policy or custom under which unconstitutional practices occurred or was grossly negligent in supervising subordinates. Colon, 58 F.3d at 873.

Accordingly, State Defendants' motion on this ground should be granted.


### D. First Amendment

County Defendant Farrell argues that Konovalchuk's retaliation claim against him is meritless. To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not

guilty at the disciplinary hearing, and statements by defendants as to their motives."

Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. Jackson, 549 F. Supp. 2d at 214–15. Therefore, conclusory allegations alone are insufficient. Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

In this case, Konovalchuk has failed to establish an issue of material fact in his retaliation claim against Farrell. Konovalchuk contends that Farrell denied him food and water and exposed him to ETS in retaliation for filing a complaint against the arresting officers. The filing of lawsuits and grievances is a constitutionally protected activity. See Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996); Mateo v. Fischer, 682 F. Supp. 2d

423, 434 (S.D.N.Y. 2010).  However, Konovalchuk does not allege how Farrell had knowledge of his civilian complaint against the arresting officers.  Farrell was not involved in the July 28, 2011 incidents and the record is devoid of any evidence evincing a causal connection between the civilian complaint and the events of October 11, 2011.  Were Konovalchuk's claim grounded in the commencement of this federal action, such a claim is also baseless.  Konovalchuk makes no reference to any lawsuit filed against the arresting officers other than this instant action, which was filed on November 14, 2011.  Dkt. No. 1. The events giving rise to the claims against Farrell occurred on October 11, 2011.  Indeed, Konovalchuk makes no factual assertions establishing how on October 11, 2011 Farrell could have known that Konovalchuk had intended to file this lawsuit.  As such, there is no causal evidence in the record linking a constitutionally protected activity to adverse actions taken against Konovalchuk.  Therefore, Konovalchuk cannot establish his First Amendment retaliation claim against Farrell.

Accordingly, County Defendants' motion on this ground should be granted.


### E.  Fourth Amendment

### i.  Excessive Force

The Fourth Amendment prohibits a law enforcement officer from using excessive force during the course of effecting an arrest.  <u>Tracy v. Freshwater</u>, 623 F.3d 90, 96 (2d Cir. 2010) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)).  However, in making an arrest, a law enforcement officer "necessarily carries . . . the right to use some degree of physical coercion or threat thereof to effect it."  <u>Graham</u>, 490 U.S. at 396 (citing <u>Terry v. Ohio</u>, 392 U.S. 1, 22–27 (1968)).  In determining whether an officer used excessive force in executing

an arrest, the Court examines whether the force used is objectively unreasonable "in light of the facts and circumstances confronting [the officer], without regard to the officer['s] underlying intent or motivation."  Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006) (quoting Graham, 490 U.S. at 397).  This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Graham, 490 U.S. at 396 (internal quotation marks and citations omitted).

To measure reasonableness, the Court "consider[s] the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest."  Jones, 465 F.3d at 61 (quoting Thomas v. Roach, 165 F.3d 137, 143 (2d Cir. 1999)).  Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. (quoting Graham, 490 U.S. at 396) (internal quotation marks omitted).  A successful excessive force claim under the Fourth Amendment requires the use of force that is serious or harmful, not merely de minimis.  Drummond v. Castro, 522 F. Supp. 2d 667, 678–79 (S.D.N.Y. 2007).  "[N]ot every push or shove" is unconstitutionally excessive.  Maxwell v. City of New York, 380 F.2d 106, 108 (2d Cir. 2004) (internal quotation marks and citation omitted).

### a.  State Defendants

In this case, Konovalchuk contends that Cuda and Pezdek subjected him to excessive force by kicking and stomping him while he was handcuffed on the ground.  As discussed supra, Konovalchuk cannot show that either Cuda or Pezdek was present before or during

the arrest.  Because no genuine issue of material fact exists with respect to these claims, Konovalchuk's excessive claims against Cuda and Pezdek must be dismissed.  <u>Anderson</u>, 477 U.S. at 247–48.

In the alternative to the lack of his personal involvement, State Defendants argue that the excessive force claim against Carroll should be dismissed on its merits.  Konovalchuk contends that Carroll subjected him to excessive force by gripping his neck while threatening him verbally and with a heavy police radio.  First, verbal abuse on its own "does <u>not</u> rise to the level of a constitutional violation."  <u>Jordan v. Fischer</u>, 773 F. Supp. 2d 255, 276 (N.D.N.Y. 2011) (citing <u>inter</u> <u>alia</u> <u>Purcell v. Coughlin</u>, 790 F.2d 263, 265 (2d Cir. 1986) (emphasis in original); <u>see</u> <u>also</u> <u>Feldman v. Lyons</u>, 852 F. Supp. 2d 274, 280 (N.D.N.Y. 2012) (collecting cases).  Second, merely gripping the neck is considered <u>de</u> <u>minimis</u> use of force that does not amount to a Fourth Amendment violation.  <u>See</u>, <u>e.g.</u>, <u>Romano v. Howarth</u>, 998 F.2d 101, 105 (2d Cir. 1993) ("a <u>de</u> <u>minimis</u> use of force will rarely suffice to state a Constitutional claim."); <u>Vogeler v. Colbath</u>, No. 04-CV-6071 (LMS), 2005 WL 2482549, at *10–11 (S.D.N.Y. Oct. 6, 2005) (Dkt. No. 97-5 at 39–48) ("While Plaintiffs may have been lifted [off the ground by their arms while lying handcuffed face down] in an unconventional manner, they have failed to show that such action was any more than de minimis force exerted during the course of an arrest . . . ." (citation omitted)).  Therefore, Konovalchuk's excessive force claim against Carroll cannot with stand a motion for summary judgment.

Accordingly, State Defendants' motion on this ground should be granted.

## b. City Defendants

City Defendants argue that they did not use excessive force when they arrested Konovalchuk and the claim is meritless. Konovalchuk contends that defendants Cerminaro, Anken, French, Mekic, Moore violated his Fourth Amendment rights when they assaulted him with excessive force while he was handcuffed, lying face-down on the ground, then slammed him against a wall. Here, defendants have failed to show the absence of a material fact with respect to this claim.

It is undisputed that on July 28, 2011 Konovalchuk was engaged in a high-speed car chase with marked and unmarked police vehicles in an attempt to escape from an arrest. However, Konovalchuk contends that as soon as he realized he was trapped in the trailer park, he voluntarily exited his vehicle and surrendered to the police. Further, Konovalchuk avers that he voluntarily placed himself on the ground to be handcuffed and defendants kicked and stomped on him despite his lack of resistance. Konovalchuk was then slammed against a wall while he was handcuffed. Defendants on the other hand, argue that Konovalchuk hid his hands underneath his body and was thrashing about to resist being handcuffed. This competing evidence rests on Konovalchuk's credibility on one hand and defendants' on the other. Despite his persistent attempt to resist arrest, Konovalchuk maintains that he eventually surrendered on the ground with his hands behind his back. Even though the City Defendants submitted a civilian's statement of what was witnessed on July 28, 2011, the statement suggests that force was used and Konovalchuk struggled but it does not show the absence of excessive force. Thus, it cannot be said that no rational factfinder could find in favor of the plaintiff. Gallo, 22 F.3d at 1223–24. Crediting the pro se plaintiff's account of the events, as required by the governing law, the alleged kicking,

punching, and stomping carried out by Cerminaro, Anken, French, Mekic, Moore would be objectively unreasonable and disproportional to the circumstances confronting those officers.  <u>Jones</u>, 465 F.3d at 61.  Therefore, the excessive force claims against Cerminaro, Anken, French, Mekic, Moore survive their cross-motion for summary judgment.

City Defendants also fail to establish the absence of material facts surrounding further excessive claims against Cerminaro.  Konovalchuk avers that Cerminaro violated his Fourth Amendment rights when Cerminaro kicked and stomped on him, twice choked him, threw him into a police vehicle, hitting his head on the car door, and verbally taunted him.  Cerminaro attested that he only pressed his body weight on Konovalchuk's upper torso in order to assist in releasing Konovalchuk's arms from under his body for handcuffing.  Again, while verbal abuse alone is not sufficient to give rise to an Eighth Amendment violation, crediting Konovalchuk's allegations, Cerminaro's use of force would be objectively unreasonable in light of Konovalchuk's lack of resistance.  <u>Jones</u>, 465 F.3d at 61.

Accordingly, City Defendants' motion on this claim should be denied.

### ii.  Probable Cause[13]

To the extent Konovalchuk attempted to allege the lack of probable cause for his arrest, City Defendants argue that such a claim is without merit.  The Fourth Amendment protects

---

[13]  Issuance of a parole warrant is administrative in nature.  <u>United States ex rel. Randazzo v. Follette</u>, 418 F.2d 1319, 1322 (2d Cir. 1969).  As such, the procedure behind issuance is not cognizable on federal review.  <u>See</u> generally <u>Russell v. Coughlin</u>, 910 F.2d 75, 78 (2d Cir. 1990) ("The fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action does not settle what protection the federal due process clause requires.") (internal quotation marks and citations omitted); <u>Dixon Goord</u>, 224 F. Supp. 2d 739, 744–45 (S.D.N.Y. 2002).

the rights of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV.  Searches and seizures may be conducted if there exists probable cause to believe that a crime has been committed and that evidence of that crime is present on the person or premises to be searched.  Id.

Konovalchuk's status as a parolee afforded him a diminished expectation of privacy. See Samson v. California, 547 U.S. 843, 852 (2006) ("[P]arolees . . . have severely diminished expectations of privacy by virtue of their status alone."); United States v. Massey, 461 F.3d 177, 179 (2d Cir. 2006) ("A parolee's reasonable expectations of privacy are less than those of ordinary citizens, and are even less so where, as here, the parolee, as a condition of being released from prison, has expressly consented to having his residence searched by his parole officer.") (internal quotation marks and citations omitted); United States v. Pabon, 603 F. Supp. 2d 406, 415 (N.D.N.Y. 2009) (same).  Additionally, where "a parolee is charged with violating his parole conditions and a warrant for his arrest has been issued, the parolee is removed one step farther from the constitutional protection enjoyed by ordinary citizens."  Pabon, 603 F. Supp. 2d at 415 (internal quotations and citations omitted).

The probable cause requirement for a parole warrant is satisfied where a parole officer demonstrates the existence of evidence sufficient to establish probable cause to believe that the parolee violated a condition of his or her parole.  See United States v. Basso, 632 F.2d 1007, 1013 & n.9 (2d Cir. 1980) ("[T]he probable cause necessary to make a warrant valid in parole cases could be established merely by a presentation of satisfactory evidence that a person had violated the conditions of his release, a standard looser than that required

30

to satisfy the probable cause requirements for a criminal warrant."); see also Morrissey v. Brewer, 408 U.S. 471, 487 (1972) (holding that requirement of probable cause for a parole warrant is satisfied by a showing that the parolee committed acts constituting a violation of parole conditions).  "Probable cause requires an officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citations omitted).  Additionally, due to the fluidity of the concept, courts are instructed to consider the "totality of the circumstances" in making any probable cause determination.  Id. (citations omitted).

In this case, Konovalchuk concedes that he violated his parole conditions in July 2011, which is supported by record evidence demonstrating that he was charged with breaking his curfew, failing to report to his parole officer, and leaving his parole approved residence without notifying his parole officer.  Dkt. No. 97-14.  Furthermore, the arrest warrant charged Konovalchuk with committing a robbery, a type of crime for which he was convicted of in the past.  Therefore, a reasonable person would believe that Konovalchuk had engaged in criminal activity and there was probable cause to issue the parole warrant. Additionally, because probable cause existed, any claims for false arrest and imprisonment are meritless.  See Bonide Prods., Inc. v. Cahill, 223 F.3d 141, 145 (2d Cir. 2000) ("To prove a § 1983 or state law claim of malicious prosecution, [a plaintiff] must establish [inter alia] ... that there was no probable cause for the criminal proceeding; ..."); Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (quotation marks and citation omitted)); Zanghi v.

Inc. Vill. of Old Brookville, 752 F.2d 42, 45 (2d Cir. 1985) ("It is abundantly clear that a finding of probable cause will defeat state tort claims for false arrest, false imprisonment and malicious prosecution."). Thus, we do not reach the issues with respect to the other elements of these claims.

Accordingly, City Defendants' motion on this ground should be granted.


## F. Fourteenth Amendment

Konovalchuk contends that when he was a pretrial detainee:  (1) defendant Farrell subjected him to cruel and unusual punishment by denying him food and water and exposed him to second-hand cigarette smoke; (2) defendants Petrie and Watson were deliberately indifferent to his medical needs by denying him medical attention; (3) defendants Carroll, Uryniak, Scully, Moore failed to intervene when he was assaulted on the ground and slammed against a wall; (4) defendants Anken, French, Mekic, Moore, Uryniak, Scully, Carroll, Cuda, Pezdek failed to intervene when Cerminaro choked him twice and threw him into a police vehicle; and (5) defendants Cuda, Pezdek, Anken, Scully, Uryniak, and Moore failed to intervene Carroll gripping his neck.  Such claims must be analyzed under the Fourteenth Amendment's Due Process Clause.

The Due Process Clause provides that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Bell v. Wolfish, 441 U.S. 520, 535–36 (1979) (citations omitted).  However, the standards when evaluating deliberate indifference to a person in custody are identical whether under the Eighth or Fourteenth Amendment.  Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) ("Claims should be analyzed under the same standard irrespective of whether they are brought under the

Eighth or Fourteenth Amendment."); <u>see</u> <u>also</u> <u>Shane v. Winnebego Cnty. Dep't of Soc.</u> <u>Servs.</u>, 489 U.S. 189, 199–200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . [including] food, clothing, shelter, medical care, and reasonable safety . . . .") (citations omitted). Accordingly, cases analyzed under the Eighth Amendment provide guidance in analyzing cases, as here, considered under the Fourteenth Amendment.  Therefore, Konovalchuk's cruel and unusual punishment, deliberate indifference, and failure to intervene claims will be considered under Eighth Amendment standards.  The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishment."  U.S. CONST. amend. VIII.

### i.  Exposure to Environmental Tobacco Smoke ("ETS")

To show that a prison official has violated the Eighth Amendment through deliberate indifference, a plaintiff must demonstrate that: (1) the conditions of confinement objectively posed a "substantial risk of serious harm," and (2) the defendant was subjectively aware of and unreasonably disregarded this health or safety risk.  <u>Helling v. McKinney</u>, 509 U.S. 25, 33–35 (1993); <u>Farmer v. Brennan</u>, 511 U.S. 825, 839 (1994).  To satisfy the objective prong and establish a serious illness or injury resulting from exposure to ETS, "a plaintiff must show that he himself is being exposed to unreasonably high levels of ETS."  <u>Warren v. Keane</u>, 196 F.3d 330, 333 (2d Cir. 1999) (citing <u>Helling</u>, 509 U.S. at 35) (internal quotation marks omitted); <u>Gill v. Smith</u>, 283 F. Supp. 2d 763, 766 (N.D.N.Y. 2003) (citing same).  Not only must the exposure actually cause the inmate potential harm but "society [must] consider[] the risk . . . to be so grave that it violates contemporary standards of decency to

33

expose <u>anyone</u> unwillingly to such a risk."  <u>Id.</u> (quoting <u>Helling</u>, 509 U.S. at 35–36).

Subjectively, a plaintiff must demonstrate that the defendant "knew of and disregarded an

excessive risk to inmate health or safety."  <u>Colon v. Drew</u>, 335 F. App'x 86, 87–88 (2d Cir.

2009) (alterations and citations omitted).  Additionally, the court must assess "the

[defendants'] current attitudes and conduct," towards the environment, evaluating whether

"[defendants] are ignoring the possible dangers posed by exposure to ETS."  <u>Helling</u>, 509

U.S. at 36–37.

    In the prison context, "[courts have] granted summary judgment for the defendant

because the plaintiff failed to provide any evidence about the level of smoke in the facility,

the degree of exposure, or any medical problems associated with exposure to ETS."  <u>Gill v.</u>

<u>Smith</u>, 283 F. Supp. 2d at 767 (citing <u>inter alia</u>, <u>Davidson v. Coughlin</u>, 920 F. Supp. 305,

309 (N.D.N.Y. 1996).  In this case, Konovalchuk's ETS claim against Farrell must fail.  First,

the record is devoid of any evidence showing that Konovalchuk suffered any medical

problems associated with the ETS on October 11, 2011.  Second, Konovalchuk does not

allege the ETS caused him medical problems at the time or he developed medical issues at

a later time.  Third, even accepting Konovalchuk's allegations as true, exposure to cigarette

smoke for five hours within one day does not constitute an unreasonably high level of ETS.

<u>See</u>, <u>e.g.</u>, <u>Gill v. Bracey</u>, No. 99-CV-10429, 2001 WL 34045758, at *2, *4 (S.D.N.Y. Jul. 17,

2001) (finding ETS was not unreasonably high where the plaintiff was exposed to the ETS

for four and a half hours a day in the law library and in line at the medical dispensary); <u>cf.</u>

<u>Helling</u>, 509 U.S. at 35–36 (living with a cellmate who smokes five packs of cigarettes a day

may satisfy the objective prong); <u>LaCroix v. Williams</u>, No. 97-CV-790E(F), 2000 WL

1375737, at *3 (W.D.N.Y. Sept. 21, 2000) (holding that even though plaintiff was housed in

a poorly ventilated twenty-two-bed dormitory with twenty-one smokers, the lack of documentation to support the alleged resulting medical issues was insufficient to craft an Eighth Amendment claim)).  Furthermore, Konovalchuk does not contend that he advised Farrell of any particular sensitivity he had to cigarette smoke.  Thus, Farrell could not have intentionally subjected Konovalchuk's health or safety to an excessive risk.  Colon, 335 F. App'x at 87–88.  Based on the record evidence, no factfinder could reasonably find in favor of Konovalchuk.  Gallo, 22 F.3d at 1223–24.

Accordingly, County Defendants' cross-motion on this ground should be granted.


### ii.  Denial of Food and Water

As the Second Circuit has noted, courts have not explicitly held that the denial of food is a per se violation of a prisoner's Eighth Amendment rights.  Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (citing Moss v. Ward, 450 F. Supp. 591, 596 (W.D.N.Y. 1978)).  However, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension."  Id. (citing inter alia Cunningham v. Jones, 567 F.2d 653, 659–60 (6th Cir. 1977)).  For example, while the deprivation of one or two meals might not constitute cruel and unusual punishment, depriving a prisoner of all food for four consecutive days when there is no record evidence showing that the prisoner had committed a rule violation was held to have violated the Eighth Amendment.  Moss, 450 F. Supp. at 596–97.  Further, a combination of the "denial of noon meals on one limited occasion, the denial of exercise while on keeplock confinement, and being confined in [a] cell under keeplock confinement for four, twenty-one and twenty-one days on three separate occasions with no alleged unusual conditions" have been deemed insufficient to

amount to cruel and unusual punishment under Eighth Amendment.  Gill v. Hoadley, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) (collecting cases).  Here, it is undisputed that Konovalchuk missed two consecutive meals on October 11, 2011 while being transported to-and-from the courthouse.  However, it is also undisputed that Konovalchuk was provided three meals on the previous day as well as dinner upon his return to Monroe.  Such deprivation is not substantial and does not amount to cruel and unusual punishment.  Moss, 450 F. Supp. at 596–97.

Furthermore, Konovalchuk's claim with respect to the deprivation of drinking water is baseless.  Konovalchuk admitted that he had access to water prior to leaving for court and after he returned from court.  Konovalchuk also does not controvert Farrell's contention that Konovalchuk had access to a water foundation while being held at the Utica City Court.  "Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."  Beckford v. Portuondo, 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001).  Moreover, while Konovalchuk alleged that Farrell had denied him food and water in retaliation for filing a federal action, as discussed supra, Konovalchuk's retaliation claim is without merit.  As such, the facts before the Court do not draw an inference of punitive intent in allowing Konovalchuk to miss meals.  Smart v. City of New York, No. 09-CV-2203 (HB), 2009 WL 862281, at *10 (S.D.N.Y. Apr. 1, 2009) ("deliberate denial of food, water or access to a restroom for fourteen hours is not reasonably related to any legitimate governmental purpose and thus the facts . . . support an inference of punitive intent" (citing cases)).  Thus, even viewing the facts in the light most favorable to the plaintiff, missing two consecutive meals and being deprived of water during the same period of time, without more, does not give rise to an Eighth Amendment violation.

Accordingly, County Defendants' cross-motion on this ground should be granted.

### iii. Medical Indifference

City Defendants do not address Konovalchuk's medical indifference claims against Petrie, Watson, or Cerminaro.  Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed in forma pauperis, "the court shall dismiss the case at any time if the court determines that  . . . the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).  Accordingly, the Court sua sponte addresses these claims.

The Eighth Amendment prohibition extends to the provision of medical care.  Shane, 489 U.S. at 199–200.  The test for a § 1983 claim is twofold.  First, the pretrial detainee must show that the condition to which he was exposed was sufficiently serious.  Farmer, 511 U.S. at 834.  Second, the pretrial detainee must show that the official demonstrated deliberate indifference by knowing of the risk and failing to take measures to avoid the harm.  Id.  "[O]fficials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

"'Because society does not expect that [pretrial detainees] will have unqualified access to healthcare,' a [pretrial detainee] must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable

doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the pretrial detainee "to prove that the [defendant] knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, defendant officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a section 1983 claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

In this case, an issue of material fact exist as to whether Konovalchuk sustained serious injuries as a result of the alleged assaults.  Konovalchuk alleged that he suffered injuries to his neck, face, and head.  While medical records do not substantiate Konovalchuk's allegation of a "post-traumatic concussion," they do show that Konovalchuk has complained of chronic migraine headaches between August and October of 2011 and June through November of 2012.  Despite being treated with pain medication, those headaches are ongoing.  Brock, 315 F.3d at 162–63.  "[C]hronic migraine headaches are often found to be

38

sufficiently serious to warrant constitutional protection." <u>De Jesus v. Albright</u>, No. 08-CV-5804 (DLC), 2011 WL 814838, at *9 (S.D.N.Y. Mar. 9, 2011) (citing <u>inter</u> <u>alia</u> <u>Benjamin v. Kooi</u>, No. 07-CV-0506, 2010 WL 985844, at *7 (N.D.N.Y. Feb. 25, 2010) (collecting cases)). Therefore, Konovalchuk has proffered sufficient facts establishing an issue of material fact with respect to objective prong to his medical indifference claims.

Konovalchuk has also proffered sufficient allegations to establish a question of fact with respect to the subjective prong. City Defendants do not controvert Konovalchuk's allegation that both Petrie and Watson refused to obtain medical attention for Konovalchuk. While Watson retrieved an officer to photograph Konovalchuk's injuries, medical attention was not provided. If Petrie and Watson were indeed made aware of Konovalchuk's injuries but failed to provide medical attention, this would be an intentional denial or delay in providing Konovalchuk access to medical care. <u>Estelle</u>, 429 U.S. at 104. As for Cerminaro, he maintains that Konovalchuk declined to see medical personnel. This competing evidence requires resolution by a jury. As such, questions of material fact remain with the subjective prong.

Accordingly, Konovalchuk's medical indifference claims should remain in this action.


### iv. Failure to Intervene

"Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." <u>Jean-Laurent v. Wilkinson</u>, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citations omitted). To establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would

know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." Id.

### a. State Defendants

Konovalchuk contends:  (1) Carroll failed to intervene when he was being assaulted on the ground and slammed against a wall; (2) Carroll, Cuda, and Pezdek failed to intervene Cerminaro choking him and throwing him into a police vehicle; and (3) Cuda and Pezdek failed to intervene Carroll tightly gripping his neck while threatening him with a police radio. Konovalchuk has failed to raise a question of material fact regarding Carroll, Cuda, and Pezdek's actions.  Despite his conclusory allegations, as discussed supra, Konovalchuk cannot establish the presence of all three defendants at the time of his arrest.  The three officers would not have had a realistic opportunity to intervene and prevent harm to Konovalchuk nor would they have known that Konovalchuk's constitutional rights were violated, thus, triggering the need to take reasonable steps to intervene.  Jean-Laurent, 540 F. Supp. 2d at 512.

Accordingly, State Defendants' motion on this ground should be granted.

### b. City Defendants

City Defendants do not address Konovalchuk's failure to intervene claims.  The Court sua  sponte addresses them pursuant to 28 U.S.C. § 1915.

Konovalchuk contends that: (1) Uryniak, Scully, and Moore failed to intervene when he was being assaulted on the ground and slammed against a wall; (2) Anken, French, Mekic, Moore, Uryniak, and Scully failed to intervene Cerminaro choking him and throwing him into

a car; and (3) Anken, Scully, Uryniak, and Moore failed to intervene Carroll tightly gripping his neck and threatening him with a police radio.  First, Konovalchuk's claims against Scully must be dismissed as the record is devoid of any evidence establishing that Scully was present at the scene before, during, or after at the arrest.  <u>Coleman</u>, 2012 WL 4480684, at *9; <u>De Michele</u>, 2012 WL 4354763, at *16.  Scully attested that he learned about Konovalchuk's arrest while Konovalchuk was being booked.  As such, despite Konovalchuk's conclusory and unsubstantiated assertion, he cannot establish that Scully had a realistic opportunity to intervene and prevent the alleged misconduct.  <u>Jean-Laurent</u>, 540 F. Supp. 2d at 512.

Second, because having his neck tightly gripped constitutes <u>de</u> <u>minimis</u> use of force, as discussed <u>supra</u>, Uryniak, Moore, Anken, French, and Mekic were not obligated to intervene those use of force instances.  <u>See</u> <u>Scott v. City of White Plains</u>, No. 10-CV-1887 (KBF), 2013 WL 1313774, at *7 (S.D.N.Y. Mar. 18, 2013) (Dkt. No. 97-5 at 32–38) ("defendants were under no obligation to intervene where the underlying use of force was not excessive" (citing <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir. 1994)); <u>see</u> <u>also</u> <u>Gillard v. Hamel</u>, No. 09-CV-0431 (TJM)(DEP), 2012 WL 967064, at *9 (N.D.N.Y. Feb. 24, 2012) (Dkt. No. 97-4 at 3–10) (granting summary judgment on failure to protect claim where the underlying force and any resulting injuries were <u>de</u> <u>minimis</u> and constitutionally insignificant).

Turning to the remaining claims, it is undisputed that Uryniak, Moore, Anken, French were present during Konovalchuk's arrest.  The City Defendants do not proffer any evidence to controvert claims against Mekic.  Issues of material fact exists as to whether Uryniak, Moore, Anken, French, and Mekic had the opportunity to intervene and while Konovalchuk was assaulted on the ground, choked, thrown against a wall, and thrown into

a police vehicle, thereby hitting his head against a car door. <u>Jean-Laurent</u>, 540 F. Supp. 2d at 512. It has been held that an issue of material exists for the jury where the defendant shoved an arrestee into a police vehicle head first, causing the arrestee's head to strike a metal partition in the car, resulting in subsequent injuries. <u>Maxwell v. City of New York</u>, 380 F.3d 106, 108 (2d Cir. 2004). The Second Circuit has also held that allegations involving plaintiffs being thrown to the ground, dragged on the ground face down, and had head slammed into a wall to be sufficient to allow a reasonable jury to conclude that excessive force was used. <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 124 (2d Cir. 2004) (citing <u>Robison v. Via</u>, 821 F.2d 913, 923–24 (2d Cir. 1987) (holding allegations that defendant officer yanked arrestee out of a car, threw her against it, and pinned her arm behind her back were sufficient to withstand summary judgment)). Thus, City Defendants would be obligated to intervene in these claims.

Accordingly, Konovalchuk's failure to intervene claims against (1) Uryniak and Moore for the assault on the ground and slamming against a wall and (2) Anken, French, Mekic, Moore, and Uryniak for Cerminaro's choking and throwing Konovalchuk into a car should remain in this action.

### G. Qualified Immunity

Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Aiken v. Nixon</u>, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), <u>aff'd</u>, 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly

defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.

Here, Farrell claims that even if Konovalchuk's Fourteenth Amendment claims against him are substantiated, he is nevertheless entitled to qualified immunity. The second prong of the inquiry need not be addressed with respect to Konovalchuk's Fourteenth Amendment claims against Farrell because, as discussed supra, it has not been shown that Farrell violated Konovalchuk's Fourteenth Amendment rights. Accordingly, County Defendants' cross-motion on this ground should be granted.

The City Defendants argue that were Konovalchuk's Fourth Amendment excessive force claims against them substantiated, they are entitled to qualified immunity. It is clear that on July 28, 2011, a parolee has a right against the use of excessive force by a law enforcement officer during the course of his arrest. Tracy, 623 F.3d at 96. Thus, accepting all of Konovalchuk's allegations as true, qualified immunity cannot be granted to City Defendants for the alleged Fourth Amendment violations. Accordingly, City Defendants' cross-motion on this ground should be denied.

43

### H. Municipal Liability

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 691 (1978). "[T]o prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008). Because only Konovalchuk's claims against City Defendants should survive summary judgment, the Court need not reach the claim of municipal liability against Oneida.

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" Davis v. City of New York, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), aff'd, 75 F. App'x 827 (2d Cir. 2003). Two situations that constitute a municipal policy are (1) where there is an officially promulgated policy, Monell, 436 U.S. at 690, and (2) a single act taken by a municipal employee who has final policymaking authority in the realm in which the action was taken. Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986). On the other hand, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 404 (1997). The custom must be permanent and well-settled. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (citation omitted). Neither a policy nor a custom can be established based on a single instance of unconstitutional conduct by a municipality

employee. See City of Okla. City v. Tuttle, 471 U.S. 808, 831 (1988) (Brennan, J., concurring in part and concurring in the judgment) ("To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict respondeat superior liability rejected in Monell . . . ."). "Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior is insufficient to establish a Monell claim." Devarnne v. City of Schenectay, No. 10-CV-1037, 2011 WL 219722, at *3 (N.D.N.Y. Jan. 21, 2011) (quoting McAllister v. New York City Policy Dep't, 49 F. Supp. 2d 688, 705 (S.D.N.Y. 1999)).

Here, assuming there has been a constitutional injury in connection with the remaining claims, Konovalchuk has failed to show a dispute of material fact with respect to the existence of a municipal policy or custom causing such an injury. Konovalchuk has provided no allegations or evidence to support an inference that Utica has a custom or practice of tolerating police abuse. Konovalchuk submits to the Court a General Order of the UPD on the use of physical force, which states as its policy that "officers shall use only that level of physical force necessary in the performance of their duties . . . ." Dkt. No. 94-2 at 40–42. However, despite his conclusory statements, Konovalchuk does not show how the General Order was deficient and caused him a constitutional injury. Roe, 542 F.3d at 36; Monell, 436 U.S. at 690. Furthermore, Konovalchuk does not allege, nor does the record reflect, that any City Defendants possessed the final policymaking authority in training officers on the use of physical force. Pembaur, 475 U.S. at 480–81. As such, Konovalchuk cannot prove the existence of an unconstitutional official policy for the purposes of his Monell claim. Konovalchuk has also failed to raise a question of material fact with respect to the existence of an unconstitutional custom or practice permitted by

45

Utica.  Other than his conclusory assertions, Konovalchuk proffers nothing more to show that the alleged failure to train employees on preventing police abuse was so widespread, permanent, and well-settled, that the practice has the force of law.  Brown, 520 U.S. at 404; Praprotnik, 485 U.S. at 127.  Thus, Konovalchuk has failed to show the existence of a policy or custom for his municipality liability claim.

As for theory of the failure to train, a plaintiff must show that such failure "amount[s] to 'deliberate indifference to the rights of persons with whom the untrained employees come into contact."  Connick v. Thompson, –– U.S. ––, 131 S. Ct. 1350, 1359 (2011) (altercations and citation omitted).  A plaintiff must prove that "a municipal actor disregarded a known or obvious consequence of his action."  Id. at 1360 (internal quotation marks and citation omitted).  Further, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for the purposes of failure to train."  Id. (internal quotation marks omitted).  Here, Konovalchuk does not proffer specific and substantiated arguments involving deficiencies in Utica's training programs.  Further, Konovalchuk does not proffer any evidence showing how the policy-makers of Utica were deliberately indifferent to "the risk that [their] employees would unconstitutionally apply [their] policies without more training."  Amnesty Am., 361 F.3d at 129.  Therefore, Konovalchuk has failed to establish any deficiencies in the training programs caused a constitutional violation or that the failure to train was the product of deliberate indifference.  Okin v. Village of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 440–41 (2d Cir. 2009) (prevailing in a failure to train claim requires "[t]he plaintiff [to] offer evidence to support the conclusion that the training program was inadequate, not that a particular officer may be unsatisfactorily trained or that an otherwise sound program has occasionally been

negligently administered, and that a hypothetically well-trained officer would have avoided the constitutional violation." (internal quotation marks and alterations omitted)).

Given the reasons above and the conclusory nature of Konovalchuk's assertions, a reasonable factfinder would not be able to find in Konovalchuk's favor and the <u>Monell</u> claims must be dismissed. Accordingly, County and City Defendants' cross-motions on this ground should be granted.

### IV. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that Konovalchuk's motion for summary judgment (Dkt. No. 94) be **DENIED**.

2. **RECOMMENDED** that State Defendants' motion for summary judgment (Dkt. No. 97) and County Defendants' cross-motion for summary judgment (Dkt. No. 98) be **GRANTED** in their entirety.

3. Further **RECOMMENDED** that City Defendants' cross-motion for summary judgment (Dkt. No. 100) be **GRANTED** as to the failure to intervene claims against defendant Scully and the claim of municipal liability against defendant City of Utica and **DENIED** in all other respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** <u>Roldan v. Racette</u>, 984 F.2d

85, 89 (2d Cir. 1993); <u>Small v. Sec'y of HHS</u>, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §

636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).


Dated: October 30, 2013
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge